Patricia MAESTAS, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–96–310–CR.

Court of Appeals of Texas,
Corpus Christi.

Feb. 12, 1998.

Richard B. Gould, McAllen, for Appellant.

Theodore C. Hake, Asst. Crim. Dist. Atty., Rene Guerra, Dist. & County Atty., Edinburg, for Appellee.

Before DORSEY, FEDERICO G. HINOJOSA, Jr. and YAÑEZ, JJ.

## OPINION

FEDERICO G. HINOJOSA, Jr., Justice.

A jury found appellant, Patricia Maestas, guilty of the offense of aggravated assault with a deadly weapon,[1] and the trial court assessed her punishment at ten years' confinement. The trial court also found that the offense involved the use of a deadly weapon. By nine points of error, appellant contends that the evidence is insufficient to support her conviction, that the trial court erred in admitting certain evidence, and that her trial counsel did not provide effective assistance of counsel. We affirm.

On October 23, 1993, Jose Vicente Garcia, John January, Felipa Maldonado, and appellant were drinking at a park in Weslaco. Appellant and Garcia were romantically involved and lived together in a small apartment in Mercedes, which was rented and inhabited by Garcia's mother. After leaving the park, Maldonado and appellant dropped Garcia and January at a Mercedes bar. Approximately one hour later, the women found the men at a different bar. January left with Maldonado, but appellant remained with Gar-

---

1. Act of May 28, 1989, 71st Leg., R.S., ch. 939, § 2, 1989 Tex. Gen. Laws 4003 (amended 1993) (current version at TEX. PENAL CODE ANN. § 22.02(a)(1) (Vernon 1994)). The amendments made no substantive changes to the relevant provision. Thus, all references will be to the current version.

cia because she did not want to return to his mother's apartment. Later, they moved to yet another bar.

Upon entering the establishment, Garcia approached a table where a woman sat alone, and he began a conversation with her in Spanish. Appellant did not understand Spanish and did not know the gist of the conversation. The woman was subsequently identified as Maria Victoria Cantu. Garcia and appellant then went to another table. Garcia told appellant that he felt sorry for Cantu because she was all alone and had no place to stay. Appellant suggested to Garcia that the woman stay with them. Cantu was invited to their table, and appellant then asked her to stay at their apartment.

At closing time, appellant, Garcia, and Cantu walked to the Garcia apartment. The next morning, Maria Cantu was found lying dead in a field near the apartment complex. She had been brutally beaten, stabbed, and strangled. Appellant was subsequently indicted for murder and aggravated assault with a deadly weapon. The jury found appellant not guilty of murder, but found her guilty of aggravated assault as charged in the indictment.

## LEGAL SUFFICIENCY

■ By her first point of error, appellant contends that the evidence is legally insufficient to support her conviction for aggravated assault with a deadly weapon. When we review a legal sufficiency of the evidence point of error, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Patrick v. State*, 906 S.W.2d 481, 486 (Tex.Crim.App.1995); *Turro v. State*, 867 S.W.2d 43, 46–47 (Tex.Crim.App.1993); *Arceneaux v. State*, 803 S.W.2d 267, 269 (Tex. Crim.App.1990). The standard is the same for both direct and circumstantial evidence

cases. *Earhart v. State*, 823 S.W.2d 607, 616 (Tex.Crim.App.1991); *Sutherlin v. State*, 682 S.W.2d 546, 548–49 (Tex.Crim.App.1984); *Vela v. State*, 771 S.W.2d 659, 660 (Tex. App.—Corpus Christi 1989, pet. ref'd). We measure the legal sufficiency of the evidence by the elements of the offense as defined by a "hypothetically correct jury charge" for the case. *Malik v. State*, 953 S.W.2d 234, 239–40 (Tex.Crim.App.1997).

■ Appellant was indicted under a two-count indictment. Count one alleged that appellant murdered Maria Cantu by strangulation, and count two indicted appellant for the aggravated assault of Cantu with a deadly weapon, to-wit: a knife. The jury was authorized to convict appellant under count one, if it believed beyond a reasonable doubt that appellant was a party [2] to Cantu's strangulation death. Appellant was acquitted of this charge.

The jury was also authorized to convict appellant of aggravated assault with a deadly weapon if it believed beyond a reasonable doubt that appellant committed the assault or acted as a party while Garcia assaulted Cantu. The jury returned a general verdict, finding appellant guilty of aggravated assault, as charged in the indictment.

■ When a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the allegations submitted, the verdict will be upheld. *Fuller v. State*, 827 S.W.2d 919, 931 (Tex.Crim.App. 1992). The State need only have sufficiently proven one of the allegations to support the verdict of guilty. *Id.* Therefore, we will review the record for evidence to support a finding that appellant was guilty either as the primary actor or as a party to the assault. *See id.*

In order to prove that appellant was the primary actor in the assault of Cantu, the State had to establish, pursuant to the charge, that appellant intentionally and knowingly caused bodily injury by stabbing Cantu with a knife in a manner which could

---

**2.** TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 1994) (1993 amendments made no apparent changes to the law as it existed at the time of the offense). A trial court may charge the jury on the law of parties even if there is no such allegation in the indictment. *See Goff v. State*, 931 S.W.2d 537, 544 n. 5 (Tex.Crim.App.1996); *Crank v. State*, 761 S.W.2d 328, 352 (Tex.Crim.App.1988).

cause death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 22.02(a)(1) (Vernon 1994). After reviewing the jury charge, we conclude it is the correct charge for the case. *See Malik,* 953 S.W.2d at 239–40.

Based on appellant's statement to police, the record reflects that appellant believed Garcia wanted to have sex with Cantu to get back at appellant, because Garcia had overheard appellant call her ex-husband "babe" during a telephone conversation. Upon arriving at the apartment with Cantu and Garcia, appellant went to take a shower. When appellant returned to the living room, she found Garcia, naked, sitting on a couch where Cantu, apparently dressed, was lying.

According to appellant's statement, she left the room, but Garcia brought her back and made her sit on a nearby chair. Apparently under the impression that Cantu knew who had killed his brother, Garcia began to beat and strangle her in an attempt to force her to answer his questions. Appellant then retrieved a knife from the kitchen at Garcia's behest and took it into the living room. However, appellant did not remember giving the knife to Garcia, or that he stabbed Cantu with it.

Felipa Maldonado testified appellant told her a similar story, but Maldonado remembered appellant saying that Garcia had cut Cantu. According to Maldonado, appellant said she had seen Garcia and Cantu kissing during the walk to the apartment. Appellant also told Maldonado that Garcia and Cantu were "making out" when she got out of the shower.

According to her statement, appellant remembers Garcia helping Cantu up off the floor and asking where all the blood was coming from. Garcia then took Cantu into the shower, and appellant cleaned up the blood. After she cleaned blood from herself, and while Garcia was in the shower, appellant searched Garcia's pants pockets, took money, and left the apartment. She hid in a ditch near the apartments until approximately 5:30 a.m., when she went to the home of Maldonado and January and asked to stay with them for awhile. Later in the morning, appellant told the couple about the previous night's events, claiming Garcia killed Cantu,

and she asked for their help. The couple agreed to take appellant to the McAllen, Texas bus station.

Officer Jaime Vasquez, of the Mercedes Police Department, testified that a knife with a black taped handle was retrieved from under a couch in the Garcia apartment approximately eight days after Cantu's murder. The knife was immediately sent to the McAllen Police Department for fingerprint analysis. W.L. Miller, Jr., a McAllen Police Department fingerprint examiner, testified that black tape was a good surface from which to lift prints. However, he was only able to lift one latent print from the black tape on the handle. He determined the print matched appellant's right thumb print.

After the knife was analyzed for prints, it was sent to the Texas Department of Public Safety Crime Lab in McAllen, Texas. Alejandro Madrigal, Jr., a serologist, testified that much of the blood testing in this case was inconclusive because the lab was unable to determine Cantu's blood type, due to contaminated blood samples and because samples were not available from Garcia and appellant. Madrigal agreed the autopsy report indicated that Cantu's blood type was O positive. Although the knife tested positive for the presence of human blood on both sides of the blade, Madrigal was not able to identify from which human the blood came. Madrigal further testified that a blouse worn by appellant when she arrived at the home of Maldonado and January, and subsequently turned in to the police by the couple, tested positive for an O-type blood antigen.

Dr. Ruben Santos, a forensic pathologist, testified Cantu was stabbed in her vagina, the stab wound was consistent with that caused by a knife, and the knife retrieved from the Garcia apartment could have caused Cantu's wound. Dr. Santos also testified the knife was capable of causing serious bodily injury and that because of the unusual nature of the wound, it had to be intentional.

Maldonado testified appellant appeared scared and nervous and claimed to be frightened that Garcia would find her. However, testimony also reflects Garcia did not attempt to find appellant subsequent to her

leaving the apartment and that appellant did not call police for help. Instead, appellant wanted Maldonado and January to drive her away from the Mercedes area. The couple took appellant to the McAllen bus station where she contacted her sister in Colorado and asked for money to fly out of McAllen. Appellant's sister cooperated with Mercedes police and convinced appellant that arrangements had been made for a flight to Colorado. When appellant arrived at the airport at 3:30 p.m. on October 4, 1993, Officer Vasquez and Officer Luis Chacon arrested her. Appellant appeared to be intoxicated at the time of her arrest.

■ After viewing the evidence in the light most favorable to the verdict, we conclude that appellant's concern over Garcia's romantic advances toward Cantu, the human blood on a knife handled by appellant, the O-type blood on appellant's blouse, and her attempt to flee the state is evidence to support the jury verdict. In addition, the fact that only appellant's thumbprint was found on the black-taped handle is evidence appellant was the primary actor in the stabbing of Cantu.

We hold that any rational trier of fact could have found the essential elements of the offense of aggravated assault with a deadly weapon beyond a reasonable doubt. We hold that the evidence is legally sufficient to support appellant's conviction. We overrule appellant's first point of error.

### DURESS

By her second point of error, appellant contends that the jury finding on the issue of duress is against the great weight and preponderance of the evidence.

Through her questioning of witnesses, appellant attempted to establish that she was a battered woman and controlled by Garcia. Testimony indicated (1) Garcia became violent when he was intoxicated, (2) he may have been jealous of appellant's attention to other men, and (3) appellant appeared to ask Garcia's permission before engaging in some conduct. There was also evidence Garcia may have slapped appellant. Maldonado testified that when appellant arrived at her house, she had blood on her face and leg. An expert witness testified that the statement appellant gave to the police showed signs appellant may have been suffering from battered-woman syndrome. This witness also testified that battered women may feel like they have no choice, although they actually do.

■ Duress is an affirmative defense to prosecution for a proscribed offense. TEX. PENAL CODE ANN. § 8.05(a) (Vernon 1994) (amendments effective September 1, 1994, made no apparent change in the law as it existed at the time of the offense at issue). The burden is on the defendant to prove an affirmative defense by a preponderance of the evidence. TEX. PENAL CODE ANN. § 2.04(d) (Vernon 1994) (amendments made no apparent changes in the law). To be successful with the duress defense, appellant's claim had to have an objective, reasonable basis. *See Cameron v. State,* 925 S.W.2d 246, 250 (Tex.App.—El Paso 1995, no pet.). When the defendant has asserted an affirmative defense, a reviewing court considers all the evidence and determines whether the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Clewis v. State,* 922 S.W.2d 126, 132 (Tex.Crim.App.1996); *Meraz v. State,* 785 S.W.2d 146, 154 (Tex.Crim.App. 1990).

■ The trier of fact is the exclusive judge of the facts, credibility of witnesses, and weight to be afforded their testimony. TEX.CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Bonham v. State,* 680 S.W.2d 815, 819 (Tex.Crim.App.1984); *Sills v. State,* 846 S.W.2d 392, 394 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd). The jury is free to accept one version of the facts, reject another, or reject all or any of a witness's testimony. *Penagraph v. State,* 623 S.W.2d 341, 343 (Tex.Crim.App.1981); *Sills,* 846 S.W.2d at 394. Simply because the defendant presents a different version of the facts does not render the State's evidence insufficient. *Anderson v. State,* 701 S.W.2d 868, 872 (Tex. Crim.App.1985); *Sills,* 846 S.W.2d at 394.

■ We find no overwhelming evidence in the record that appellant was forced

by Garcia to get a knife. Although appellant claims Garcia ordered her to get the knife, the record does not clearly reflect Garcia threatened appellant with imminent death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 8.05(a); *see also Cameron,* 925 S.W.2d at 250 (citing *Leviness v. State,* 157 Tex.Crim. 160, 247 S.W.2d 115, 118 (1952)) (taking orders from another is not sufficient to raise duress affirmative defense). The duress defense is based on compulsion by threat and focuses on the conduct of the person making the threats. *Montgomery v. State,* 588 S.W.2d 950, 953 (Tex.Crim.App. 1979); *see* TEX. PENAL CODE ANN. § 8.05(b) (Vernon 1994). Compulsion exists only if the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure. TEX. PENAL CODE ANN. § 8.05(c) (Vernon 1994).

We find that appellant's assertions to Maldonado and those added to her second police statement, that Garcia ordered her to cooperate, are self-serving. Appellant does not claim she gave the knife to Garcia. Instead, she says she does not remember Garcia with the knife or that he stabbed Cantu. The jury could have considered this evidence an attempt to cast the blame for appellant's actions upon Garcia.

In addition, we find the evidence that appellant may have been suffering from battered-woman syndrome is unpersuasive. The expert who so testified based her opinion on appellant's written statements. The witness only spoke with appellant's attorney. She did not speak with appellant, or anyone else, concerning appellant's relationship with Garcia. Thus, the expert testimony was not based on specific, objective instances of Garcia's abuse as directed at appellant prior to the murder/assault. The expert could offer no reasoned opinion on whether the relationship would cause appellant to react to directives from Garcia as if her life or safety depended on compliance. Instead, the witness speculated as to the possible meaning behind appellant's written words.

Moreover, appellant's own behavior belies the argument that she may have been a battered woman. Appellant (1) left her husband and children in Colorado to follow Gar-cia to Texas, (2) showered without permission on the night at issue, (3) took money from Garcia's pants as she left the apartment on that night, (4) made her way to a bus station, and (5) called family for help to leave Texas. At no time did appellant claim she was leaving Texas to escape from Garcia. Also, officers refuted evidence that appellant may have been struck by Garcia. The arresting officers testified that at the time appellant was arrested at the airport, her face did not appear to be bruised. No evidence was presented indicating Garcia struck appellant on prior occasions. Based on this evidence, the jury was free to disregard appellant's assertion of the battered-woman syndrome.

After reviewing all of the evidence, we hold that the jury's verdict against appellant's duress defense is not so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. We overrule appellant's second point of error.

## ILLEGAL ARREST

By her sixth, seventh, and eighth points of error, appellant complains the trial court erred in admitting evidence obtained as a result of an illegal arrest, thus violating the Fourth Amendment to the United States Constitution, article I, § 9 of the Texas Constitution, and article 38.23 of the Texas Code of Criminal Procedure, respectively.

Appellant contends that her arrest at McAllen's Miller International Airport on the afternoon of October 4, 1993, was illegal. Her argument is two-pronged. Appellant claims that the State did not prove she was arrested pursuant to a valid arrest warrant. She also claims that her arrest, pursuant to an outstanding Colorado arrest warrant, was a pretext for her arrest as a suspect in Cantu's murder. Although it appears from the record that appellant failed to preserve error on the first prong by not raising it before the trial court, we will address it in the interest of justice and because of its relevance to the other points of error.

Appellant moved to suppress all evidence obtained as a result of her arrest on October 4, 1993. She specifically wanted the trial court to suppress her fingerprints and state-

ments made after she was arrested. After a hearing on the matter, the trial court denied the motion to suppress.

At a suppression hearing, the trial court is the sole judge of the credibility of the witnesses and the weight of their testimony. *Banda v. State,* 890 S.W.2d 42, 51 (Tex.Crim.App.1994). The appellate court does not engage in its own factual review, and so long as the record supports the trial court's findings, the appellate court is not at liberty to disturb them. *Id.* at 51–52. On appellate review, the court considers only the question of whether the trial court improperly applied the law to the facts. *Id.* at 52. The trial court's decision should be reversed only for an abuse of discretion. *DuBose v. State,* 915 S.W.2d 493, 497–98 (Tex.Crim.App. 1996).

The record reflects that G.M. Slayton, a Colorado Springs, Colorado probation officer, contacted Officer Vasquez on the morning of October 4, 1993, and provided information that appellant was wanted in Colorado on a felony warrant as an escapee. Slayton subsequently sent a wanted notice, by fax, which confirmed this information. Vasquez also talked with Loraine Valencia, appellant's sister, and learned that appellant would be at the McAllen airport that afternoon. Officer Vasquez and Officer Chacon then went to the airport to await appellant's appearance. When the officers spotted appellant entering the airport at approximately 3:30 p.m., they told her she was under arrest pursuant to the Colorado felony warrant as an escapee.

At the hearing on the motion to suppress, the State introduced the "wanted notice" fax into evidence. Appellant contends the State also had to prove that the warrant underlying the notice was valid. Appellant's argument is without merit.

Article 51.13 of the code of criminal procedure provides that a person may be arrested without a warrant if the arresting officer has reasonable information the accused stands charged in a sister state with a crime punishable by death or imprisonment for a term exceeding one year. TEX.CODE CRIM. PROC. ANN. art. 51.13, § 14 (Vernon 1979);

*Morales v. State,* 513 S.W.2d 869, 870 (Tex. Crim.App.1974). The fax of the wanted notice, in combination with the telephone call from Slayton, provided reasonable information that appellant was wanted on a Colorado felony warrant as an escapee. *See Morales,* 513 S.W.2d at 869–70 (computer relayed information and telegraph); *Ex parte Bucaro,* 656 S.W.2d 217, 219 (Tex.App.—Fort Worth 1983, no pet.) (teletyped message). We conclude the State established the officers had a reasonable basis for arresting appellant.

Appellant additionally argues that her arrest, pursuant to the Colorado warrant, was a pretext for her arrest as a suspect in Cantu's murder. This argument is not persuasive.

If an officer has an objectively valid reason for arresting an individual, that the officer has ulterior motives will not cause the arrest to be illegal under either federal or state laws. *See Crittenden v. State,* 899 S.W.2d 668, 673–74 (Tex.Crim.App.1995). In this case, Mercedes police officers knew appellant was wanted on a Colorado felony warrant, and they arrested her on those grounds. That the officers were also investigating appellant's involvement in Cantu's death does not make the arrest invalid.

We hold that appellant's arrest was legal and that all evidence obtained as a result of the arrest was admissible. We overrule appellant's sixth, seventh, and eighth points of error.

RIGHT TO REMAIN SILENT

By her third, fourth, and fifth points of error, appellant complains that the trial court erred in admitting her custodial statements because the police did not scrupulously honor her right to remain silent, thus violating the Fifth Amendment to the United States Constitution, article I, § 10 of the Texas Constitution, and article 38.22 of the Texas Code of Criminal Procedure, respectively.

Appellant contends that police officers did not scrupulously honor her right to remain silent when, after she refused to be interviewed at approximately 11:15 a.m. on October 5, 1993, officers again asked her to make a statement at 8:15 p.m. the same evening.

Appellant then cooperated and gave a statement. After hearing the evidence, the trial court denied appellant's pretrial motion to suppress her custodial statements.

We must first address whether appellant exercised her right to remain silent at any time after her arrest. *Murphy v. State,* 766 S.W.2d 246, 249 (Tex.Crim.App.1989). The rule is set forth in *Miranda v. Arizona:*

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966).

### October 4, 1993

When appellant was arrested at the airport on October 4, 1993, officers handcuffed her, placed her in the front seat of an unmarked police car, and informed her of her rights. Appellant appeared intoxicated; her speech was slurred, her eyes were red, and she smelled of alcohol. Officers then drove appellant to the Mercedes police station, where she was again informed of her rights through a Warnings and Waiver form. As the warnings were read to her, appellant was asked to initial each one. She did not do this, and when she was asked to sign and date the form, she signed in the wrong location. Because they believed appellant was intoxicated and because she refused to talk to officers, appellant was placed in a female holding cell at approximately 4:30 p.m. Officers continued with their investigation into the murder by following other leads.

### October 5, 1993

The next day, at approximately 11:15 a.m., appellant was led to Officer Vasquez's office, and her rights were again read to her. At that time, appellant initialed the warnings and signed the waiver in the appropriate place. Officers testified appellant appeared rested, coherent, and sober. When appellant was asked if she wanted to make a statement, she refused and was led back to the holding cell. Again officers continued their investigation through other sources. We hold that at this point, appellant knowingly and intelligently exercised her right to remain silent. The question now becomes, did subsequent actions by police officers fail to scrupulously honor this right.

At 8:15 that evening, appellant was returned to Office Vasquez's office, her rights were properly given, and appellant agreed to give a statement. The interview lasted several hours, and Officer Vasquez made notes of appellant's responses. When the interview ended, appellant was placed back in her cell, and the officer typed her statement from the notes.

### October 6, 1993

At approximately 1:35 a.m. on October 6, 1993, appellant and Vasquez met again to go over her statement. The officer read aloud appellant's statement, which contained the warnings, and then allowed appellant to read it on her own. Appellant agreed the statement accurately reflected her remarks and signed it. Appellant was then returned to her cell.

Believing appellant's statement was not totally accurate and that Cantu's vaginal stab wound was not serious enough to have been caused by an angry male, Officer Chacon requested that Chief of Police, Jose H. Flores, III, give appellant a lie detector test. Later that morning, Chief Flores read appellant her rights, including those regarding a polygraph test. At approximately 11:30 a.m., appellant agreed to take the test. When the test was completed, Chief Flores told appellant that there were problems with some of her answers. Appellant then asked to take the test a second time.

In the meantime, Chief Flores told the investigating officers that appellant had made some statements during the polygraph

which provided more information or that were inconsistent with her written statement. Officer Vasquez asked appellant if she wanted to correct her written statement, and she agreed to do so. At 4:30 p.m., appellant was again informed of her rights, and the officer again read appellant's statement to her. As Officer Vasquez read, appellant indicated where the officer should add more information. Officer Vasquez, working on a computer, made the additions and corrections to the original statement by highlighting the new information in bold. At the end of this process, appellant was read the revised statement, then read it herself and signed it. Appellant took a second polygraph test at 5:30 p.m.

Appellant contends that by initiating the interview process again so soon after she invoked her right to remain silent at 11:15 a.m. on October 5, 1993, police did not scrupulously honor her privilege. She argues that all subsequent statements were tainted as a result of the officers not honoring her right to remain silent.

■■■■■ The *Miranda* passage quoted above cannot be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent. *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975); *Murphy*, 766 S.W.2d at 249. The critical safeguard in the passage is a person's right to cut off questioning, and admissibility of in-custody statements taken after a defendant exercises this right depends on whether the right is scrupulously honored. *Mosley*, 423 U.S. at 103, 96 S.Ct. at 326; *Murphy*, 766 S.W.2d at 249. Determining whether a resumption of questioning is consistent with scrupulous observance of the right to cut off questioning depends upon the circumstances of each case. *Murphy*, 766 S.W.2d at 249; *see Mosley*, 423 U.S. at 104–05, 96 S.Ct. at 326–27 (interrogation immediately ceased, reinitiated on different subject more than two hours later, after warnings were readministered, constitutes scrupulous honoring of right); *United States v. Bosby*, 675 F.2d 1174 (11th Cir.1982) (interrogation immediately ceased, reinitiated

two weeks later, after warnings readministered; scrupulous honoring); *Murphy*, 766 S.W.2d 246 (defendant arrested in Houston on Anderson County warrant, declines to talk, fifteen days later agrees to talk to Houston police in Anderson County jail after warnings readministered and after learning he's a suspect in Houston murder; scrupulous honoring); *Phillips v. State*, 701 S.W.2d 875 (Tex.Crim.App.1985), *overruled on other grounds, Hernandez v. State*, 757 S.W.2d 744, 752 (Tex.Crim.App.1988) (interrogation immediately ceased, defendant given lunch, returned to his cell, later that afternoon warnings repeated, defendant wanted guarantees, officer refused, confession given; scrupulous honoring).

Officers testified that each time they spoke with appellant, she was informed of her rights. When she indicated she wanted to remain silent, interrogation ceased. Appellant was not coerced, threatened, or promised anything in order to get her to talk with officers. Except at the time of her arrest, appellant was coherent, responsive, and sober. Once appellant began to talk to officers, she did not ask that the interrogation cease, nor did she ever request an attorney. Officers indicated appellant's necessities were attended to according to department policy and that appellant never voiced complaints in this regard. Although officers initiated the questioning that resulted in appellant's first statement, their ongoing investigations had led them to believe appellant was with Cantu at the scene of the murder. Approximately nine hours elapsed between appellant's intelligent exercise of her right to remain silent and her agreement to cooperate with officers. After talking to Officer Vasquez for several hours, appellant had additional time to reflect on her decision to give a statement before signing it.

Appellant did not controvert this testimony, nor did she claim she felt intimidated when officers reinitiated the interrogation process at 8:15 p.m. on October 5, 1993, after again informing her of her rights. Based on the circumstances of this case, we believe appellant's assertion of her right to remain silent was scrupulously honored by Mercedes police officers.

■ Appellant urges this Court to find that the Texas Constitution and the code of criminal procedure provide greater protection to an accused in the matter of scrupulously honoring an exercised right to remain silent than the U.S. Constitution. However, appellant provides no argument on this point or authorities in support of her position. Because the remainder of the case was adequately briefed, we decline to address this issue. TEX.R.APP. P. 38.9.

Having found that appellant's right to remain silent was scrupulously honored, we hold that the trial court did not err in admitting appellant's custodial statements. Appellant's third, fourth, and fifth points of error are overruled.

### EFFECTIVE ASSISTANCE OF COUNSEL

By her ninth point of error, appellant contends that she was denied effective assistance of counsel because her trial counsel failed to preserve, litigate, and protect the record regarding her challenge to the validity of her arrest. Appellant cites us to counsel's alleged failure to preserve error under points of error six, seven, and eight.

■ Our review of counsel's performance must be highly deferential. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984); *Garcia v. State*, 887 S.W.2d 862, 880 (Tex.Crim. App.1994). The burden of proving ineffective assistance of counsel is on the appellant and is one which requires proof by a preponderance of the evidence. *Stafford v. State*, 813 S.W.2d 503, 506 n. 1 (Tex.Crim.App. 1991); *Moore v. State*, 694 S.W.2d 528, 531 (Tex.Crim.App.1985); *Cannon v. State*, 668 S.W.2d 401, 403 (Tex.Crim.App.1984). An allegation of ineffective assistance of counsel will be sustained only if it is firmly founded and if the record affirmatively demonstrates counsel's alleged ineffectiveness. *Ex parte McWilliams*, 634 S.W.2d 815, 819 (Tex.Crim. App.1980).

Although we stated in our analysis of points six, seven, and eight that counsel may have failed to preserve error, we elected to address appellant's complaints. We found that appellant's arrest was not a pretext arrest and that the State did not have to prove the validity of the Colorado arrest warrant, but instead had to prove that the officers made their arrest on a reasonable belief appellant was wanted in Colorado. This the State did by presenting evidence of a Colorado "wanted notice." Thus, an objection by counsel on these issues would have been unnecessary and overruled.

■ Effective assistance of counsel is gauged by the totality of the representation from the pretrial representation of the accused through the punishment stage of the trial. *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex.Crim.App.1990) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065); *Ex parte Walker*, 777 S.W.2d 427, 431 (Tex.Crim.App. 1989). Thus, the trial as a whole must be reviewed and not isolated incidents of counsel's performance. *Cannon*, 668 S.W.2d at 403.

■ Having reviewed the record, we find appellant was represented by two diligent attorneys who aggressively protected their client's interests at all stages of the trial. Their cross-examination of witnesses and presentation of evidence was effective in causing the jury to acquit appellant of charges that she was a party to Cantu's murder. Counsel objected frequently to the State's questioning and to evidence the State wanted to introduce. Many of these objections were sustained. We hold that appellant was provided with effective assistance of counsel during the trial. We overrule appellant's ninth point of error.

We affirm the trial court's judgment.